UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE HEALTH CARE AUTHORITY OF )
THE CITY OF HUNTSVILLE d/b/a )
HH HEALTH SYSTEM; THE HEALTH )
CARE AUTHORITY OF THE CITY OF )
HUNTSVILLE d/b/a HUNTSVILLE )
HOSPITAL; THE HEALTH CARE )
AUTHORITY OF THE CITY OF )
HUNTSVILLE d/b/a MADISON )
HOSPITAL; THE HEALTH CARE )
AUTHORITY OF THE CITY OF )     Case Number: 1:19-op-45143-DAP
HUNTSVILLE d/b/a HUNTSVILLE )
HOSPITAL FOR WOMEN AND )
CHILDREN; HH HEALTH )
SYSTEM-MORGAN, LLC d/b/a )          **JURY DEMAND**
DECATUR MORGAN HOSPITAL - )
DECATUR and DECATUR MORGAN )
HOSPITAL - PARKWAY; THE HEALTH )   This document relates to: MDL 2804
CARE AUTHORITY OF MORGAN )
COUNTY - CITY OF DECATUR; )
HH HEALTH SYSTEM-SHOALS, LLC )
d/b/a HELEN KELLER HOSPITAL and )
RED BAY HOSPITAL; THE COLBERT )
COUNTY-NORTHWEST ALABAMA )
HEALTH CARE AUTHORITY; )
HH HEALTH SYSTEM-ATHENS )
LIMESTONE, LLC d/b/a ATHENS )
LIMESTONE HOSPITAL; THE HEALTH )
CARE AUTHORITY OF ATHENS AND )
LIMESTONE COUNTY; HH HEALTH )
SYSTEM - MARSHALL, LLC; )
ATTENTUS MOULTON, LLC d/b/a )
LAWRENCE MEDICAL CENTER; )
THE LAWRENCE COUNTY HEALTH )
CARE AUTHORITY, )
)
      Plaintiffs, )
)
vs. )
)
TEVA PHARMACEUTICAL )
INDUSTRIES, LTD.; TEVA )

PHARMACEUTICALS USA, INC.;            )
CEPHALON, INC.; JANSSEN               )
PHARMACEUTICALS, INC.;                )
ORTHO-MCNEIL-JANSSEN                  )
PHARMACEUTICALS, INC. n/k/a           )
JANSSEN PHARMACEUTICALS, INC.;        )
JANSSEN PHARMACEUTICA, INC.           )
n/k/a JANSSEN PHARMACEUTICALS,        )
INC.; MCKESSON CORPORATION;           )
CARDINAL HEALTH, INC.;                )
AMERISOURCEBERGEN DRUG                )
CORPORATION;                          )
JOHNSON & JOHNSON; ENDO               )
PHARMACEUTICALS, INC.; ENDO           )
HEALTH SOLUTIONS, INC.;               )
ALLERGAN PLC f/k/a ACTAVIS PLC;       )
WATSON PHARMACEUTICALS, INC.          )
n/k/a ACTAVIS, INC.; WATSON           )
LABORATORIES, INC.;                   )
ACTAVIS LLC; ACTAVIS PHARMA INC.)
f/k/a WATSON PHARMA, INC.;            )
MALLINCKRODT LLC;                     )
MALLINCKRODT PLC,                     )
                                      )
          Defendants.                 )

## AMENDED COMPLAINT

## I. **INTRODUCTION**

1.      Publically owned hospitals furnish a substantial amount of care to indigents and also

provide health care to rural residents of the State of Alabama that otherwise may not have access to

hospitals.  In recognition of the importance of public hospitals, the Alabama Legislature allows cities

and counties within the State of Alabama to form public corporations for the purpose of owning and

operating healthcare facilities.  § 22-21-312, Alabama Code.

2.      The Health Care Authority of the City of Huntsville d/b/a HH Health System

("HCACH") was formed pursuant to Alabama law and provides health care to residents of Madison

2

County, Limestone County, Morgan County, Colbert County, Franklin County, Lauderdale County, Jackson County, Lawrence County, Marshall County, and surrounding areas in Alabama and Lincoln County and surrounding areas in Tennessee.  HCACH owns, operates, manages and/or is affiliated with numerous hospitals, entities and/or health care authorities, including, but not limited to the following hospitals: The Health Care Authority of the City of Huntsville d/b/a Huntsville Hospital; The Health Care Authority of the City of Huntsville d/b/a Madison Hospital; The Health Care Authority of the City of Huntsville d/b/a Huntsville Hosptial for Women and Children; HH Health System - Morgan, LLC d/b/a Decatur Morgan Hospital - Decatur and Decatur Morgan Hospital - Parkway; The Health Care Authority of Morgan County - City of Decatur; HH Health System - Shoals, LLC d/b/a Helen Keller Hospital and Red Bay Hospital; HH Health System - Athens Limestone, LLC d/b/a Athens Limestone Hospital; Attentus Moulton, LLC d/b/a Lawrence Medical Center Lawrence.  These entities and the entire Huntsville Hospital System are collectively referred to as "Plaintiffs" or "Plaintiff Hospitals."

3.      The Plaintiff Hospitals are organized pursuant to Titles 11 and/or 22 of the Code of Alabama with the statutory power to "sue and be sued in their own name in civil suits and actions" including all other powers incidental and necessary to discharge the duties relative to operating as public hospitals.  §§ 11-95-7 and 22-21-318, Alabama Code.

4.      The Plaintiff Hospitals have treated, and continue to treat, numerous patients for opioid-related conditions, specifically: (1) opioid overdose; (2) opioid addiction; (3) neonatal treatment for babies born addicted to opioid because their mothers were opioid addicts, which treatment is intensive, complex, and lengthy; (4) opioid related illnesses; and (5) psychiatric and related treatment for opioid users who are committed to mental health treatment programs.

5. Opioid users frequently present themselves to Plaintiff Hospitals claiming to have illnesses and medical problems, which are actually pretexts for obtaining opioids to satisfy their cravings. Plaintiff Hospitals incur operational costs, consisting of expending time and incurring expenses, in diagnosing, testing, and otherwise dealing with the "pill seekers" before their true status can be determined and they can be rejected as patients.

6. The Plaintiff Hospitals incur operational costs in the form of surgical procedures that are more complex and expensive than would otherwise be the case if the patients were not opioid addicts, which complicates surgical procedures and requires special protective measures.

7. Collectively, the patients seeking opioid prescriptions, suffering from opioid addiction, experiencing various levels of opioid dependancy, and/or overdosing on opioids or as a result of opioid addiction will be referred to hereafter as patients with "opioid conditions." These patients' opioid conditions are the direct and proximate result of the opioid epidemic created and engineered by Defendants.

8. The Plaintiff Hospitals have a price list, which sets the prices for a comprehensive listing of items billable to a hospital patient or the patient's health insurance provider. These are the full charges for the hospitals' services. The full charges are only partially reimbursed by private health insurers, Medicare, and Medicaid. Plaintiffs have provider agreements with private health insurers whereby they accept payment from the health insurers at a discounted rate on behalf of insured patients. The difference between the full charges and the discounted rate is lost to the hospitals. Medicare and Medicaid bill hospitals at set rates that are less than the hospitals' full charges, and the difference between the set rates and the full charges is lost to the hospitals.

9. The Plaintiff Hospitals must direct scarce resources to the care and treatment of

patients suffering from opioid related conditions such as addiction, including the entire range of substance abuse disorders, overdoses, and life threatening adverse drug reaction.  These scarce resources would otherwise pay for other badly needed health and disease prevention programs.

10.     The Plaintiff Hospitals incur partial monetary losses for patients with health insurance, and total monetary losses for uninsured patients, in the treatment of patients with opioid conditions.  These patients would not have presented to Plaintiff Hopsitals and would not have had opioid conditions, but for the opioid epidemic created and engineered by Defendants.  Accordingly, Plaintiff Hospitals' aforesaid monetary losses are the direct and proximate result of Defendants' acts and omissions previously specified herein.

11.     Since opioids can be dangerous and are highly addictive, it was foreseeable to Defendants that the opioid epidemic would result in a corresponding epidemic of patients with opioid conditions at hospitals.  It was also foreseeable to Defendants that Plaintiffs would suffer the aforesaid monetary losses because of the opioid epidemic, since hospitals typically are not reimbursed for their treatment of uninsured patients and receive only partial reimbursement for their treatment of patients with health insurance.

12.     The term "opioids" include brand-name drugs like OxyContin and Percocet as well as generics like oxycodone and hydrocodone.  These drugs are derived from or possess properties similar to opium and heroin, and, as such, they are highly addictive and dangerous.  Opioids are regulated by the United States Food and Drug Administration ("FDA") as controlled substances.

13.     Opioids are not intended for long-term use.  Taken outside limited doses for short-term pain relief, opioids are addictive and destructive.  Opioids are effective treatment for short-term post-surgical and trauma-related pain, and for palliative end-of-life care.  Opioids are far too

5

addictive and too debilitating for long-term use for chronic non-cancer pain lasting three months or longer ("chronic pain").

14.    Opioids have been approved by the FDA for use in the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. Defendants, however, have manufactured, promoted, and marketed opioids for the management of pain by misleading consumers and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

15.    Addiction includes a broad spectrum of substance use disorders ranging from misuse and abuse of drugs to addition. Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder spectrum.

16.    The rising numbers of people addicted to opioids have led to significantly increased health care costs as well as the dramatic increase of social problems, including drug abuse and diversion and the commission of criminal acts to obtain opioids throughout the United States.

17.    In order to expand the market for opioids and realize increased profits, Defendants sought to create a false perception of the safety and efficacy of opioids in the minds of medical professionals and members of the public that would encourage the use of opioids for longer periods of time and to treat a wide range of problems, including such common aches and pains as lower back pain, arthritis, and headaches.

18.    Defendants accomplished the false perception of safety and efficacy through a coordinated, sophisticated, and highly deceptive marketing campaign that began in the late 1990s, became more aggressive in or about 2006, and continues to the present.

19.     Defendants accomplished their marketing campaign goal by convincing doctors, patients, and others that the benefits of using opioids to treat chronic pain outweighed the risks, and that opioids could be safely used by most patients.

20.     In 2012 alone, opioids generated approximately $8 billion in revenue for drug companies.  Of that amount, $3.1 billion went to Purdue for its OxyContin sales.  Overall profits collected by the Defendants over the relevant time frame total in the tens of billions of dollars.

21.     In 2012, an estimated 2.1 million people in the United States suffered from substance abuse disorders related to prescription opioid pain relievers.  Between 30% and 40% of long-term users of opioids experience problems with opioid abuse disorders.

22.     The National Institutes of Health ("NIH") not only recognizes the opioid abuse problem, but also identifies Defendants' "aggressive marketing" as a major cause: "Several factors are likely to have contributed to the severity of the current prescription drug abuse problem.  They include drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and *aggressive marketing by pharmaceutical companies*."

23.     In 2013, in response to a petition to require manufacturers to strengthen warnings on the labels of long-acting opioid products, the FDA warned of the "grave risks" of opioids, including "addiction, overdose, and even death."  The FDA further warned, "[e]ven proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death."  Because of those grave risks, the FDA said that long-acting or extended release opioids "should be used only when alternative treatments are inadequate."  The FDA required that - going forward - opioid makers of long-acting formulations clearly communicate these risks in their labels.

7

24.     In 2016, the FDA expanded its warnings for immediate-release opioid pain medications, requiring similar changes to the labeling of immediate-release opioid pain medications as it had for extended release opioids in 2013.  The FDA also required several additional safety-labeling changes across all prescription opioid products to include additional information on the risk of these medications.

25.     The facts on which the FDA relied in 2013 and 2016 were well known to Defendants in the 1990s when their deceptive marketing began.

26.     The Defendants hawked their opioid products in contradiction to the concerns of the FDA by aggressively promoting the idea that opioids should be taken continuously and then even supplementing them with even more opioids in the form of short-acting, rapid onset opioids for episodic pain.

27.     Defendants' marketing campaign has been extremely harmful to the residents of the State of Alabama.  Overdose from prescription pain relievers are a driving factor in a 15-year increase in opioid overdose deaths.  Deaths from prescription opioids have also quadrupled since 1999.  From 2000 to 2014 nearly half a million people died from such overdoses.  Seventy-eight Americans die every day from an opioid overdose.

28.     Alabama cities and counties, and the Plaintiff Hospitals, have been hit particularly hard by the opioid epidemic.  The death rate from drug overdose has tripled between 1999 and 2015. The DEA found that the 2015 fatal drug overdose rate reached an all time high.  The cost to the healthcare system is clear, with the Plaintiff Hosptials seeing some of the highest opioid abuse and hospitalization rates from opioid addiction.

29.     The industry wide opioid conspiracy has resulted in federal prosecution of drug

company executives.  It has also resulted in administrative fines levied to a number of Defendants. Despite the actions by law enforcement and federal agencies, the wrongful acts by the Defendants continue because of the tremendous profit incentives to their companies through the manufacture, distribution and marketing of opioids.

## II.  PARTIES

### A.  PLAINTIFFS

30.     The Health Care Authority of the City of Huntsville d/b/a HH Health System is an Alabama public corporation with its principal place of business in Madison County, Alabama. The Health Care Authority of the City of Huntsville does business throughout the Tennessee valley, including Madison County, Limestone County, Morgan County, Colbert County, Franklin County, Lauderdale County, Jackson County, Lawrence County, Marshall County, and surrounding areas in Alabama and Lincoln County and surrounding areas in Tennessee.

31.     HCACH and the hospitals it owns, operates, manages and/or is affiliated with are referred to collectively as the "Plaintiffs" or "Plaintiff Hospitals."

32.     The Plaintiff Hospitals operate Emergency Rooms year round, 24 hours a day, to treat the critically ill and to render emergency care. Emergency Room operation represents a tremendous cost and requires substantial funding from extremely limited resources.  Plaintiffs have Alabama's largest emergency and trauma program and the region's only state-designated Level I Trauma Center. A substantial number of the patients treated by Plaintiffs were treated for opioid related conditions.

33.     The Plaintiff Hospitals only collect approximately $21 out of every $100 charged for Emergency Room services. The opioid epidemic in Alabama and Tennessee is flooding the Plaintiff Hospitals with patients seeking treatment for addiction and opioid conditions. As a result, the

Emergency Rooms are flooded with patients who are unable to reimburse Plaintiff Hospitals in full for medical treatment.

34.     Plaintiff Hospitals directly sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff Hospitals seek relief. Categories of past and continuing sustained damages include, *inter alia*,; (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoes and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) and costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered directly, by the Plaintiff Hospitals.

35.     Plaintiff Hospitals have standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiffs have standing to bring all claims pled herein.

**B.      MANUFACTURER DEFENDANTS**

36.     At all relevant times, certain Defendants named below packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn, or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. These Defendants (the "Manufacturer Defendants") manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

37.     CEPHALON, INC. is a Delaware corporation with its principal place of business in

Frazer, Pennsylvania, which is registered to do business in Alabama.  TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel.  In 2011, Teva Ltd. acquired Cephalon, Inc. in October 2011.  TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania, which is registered to do business in Alabama and is a wholly owned subsidiary of Teva Ltd.  Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to collectively as "Cephalon."

38.     Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[1]  Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[2]  In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million.[3]

39.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell

---

[1] *Highlights of Prescribing Information, ACTIQ (fentanyl citrate) oral transmucosal lozenge, CII* (2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[2] *Highlights of Prescribing Information, FENTORA (fentanyl citrate) buccal tablet, CII* (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

[3] Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

40.     Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[4]  Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 - the year immediately following the Cephalon acquisition - attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including inter alia sales of Fentora.[5]  Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.

41.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New

---

[4] *E.g.*, ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).

[5] Teva Ltd., Annual Report (Form 20) 62 (Feb. 12, 2013), http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

12

Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation registered to do business in Alabama with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to collectively as "Janssen."

42.     Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

43.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, and is a wholly owned subsidiary of Endo Health Solutions Inc. Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to collectively as "Endo."

44.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States. Opioids made up roughly

13

$403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

45.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC as of June 2015. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then ACTAVIS PLC in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, which is registered to do business in Alabama, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

46.     Each of these defendants is owned by ALLERGAN PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.

47.     ALLERGAN PLC, ACTAVIS PLC, ACTAVIS, Inc., Actavis LLC, Actavis Pharma,

14

Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to collectively as "Allergan."

48.     Allergan manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States.  Allergan acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

49.     MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Mallinckrodt, LLC is a wholly owned subsidiary of MALLINCKRODT, PLC, which is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Mallinckrodt, PLC and Mallinckrodt, LLC do business as Mallinckrodt Pharmaceuticals. Mallinckrodt, PLC and Mallinckrodt, LLC are referred to collectively as "Mallinckrodt."

50.     Mallinckrodt manufactures, markets, and sells drugs in the United States including Exalgo, Roxicodone, and generic oxycodone, of which it is one of the largest manufacturers. In July 2017 Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

C.     **DISTRIBUTOR DEFENDANTS**

51.     At all relevant times, certain Defendants named below distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. These Defendants (the "Distributor Defendants") failed to comply with federal and/or state law.  Plaintiff Hospitals allege the unlawful conduct by the Distributor Defendants is responsible for

the volume of prescription opioids entering into and plaguing the geographic areas serviced by Plaintiff Hospitals.

52. McKESSON CORPORATION ("McKesson"), at all relevant times, operated as a licensed pharmacy wholesaler in Alabama. McKesson is registered with the Alabama Secretary of State as a Delaware corporation. McKesson has its principal place of business located in San Francisco, California.

53. CARDINAL HEALTH, INC. ("Cardinal") at all relevant times, operated as a licensed pharmacy wholesaler in Alabama. Cardinal is registered through various entities including Cardinal Health 100, Inc. with the Alabama Secretary of State as an Indiana corporation, with its principal office located in Dublin, Ohio. Cardinal Health, Inc. is an Indiana corporation with its principal place of business in Dublin, Ohio.

54. AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen"), at all relevant times, operated as a licensed pharmacy wholesaler in Alabama. AmerisourceBergen is registered with the Alabama Secretary of State as a Delaware corporation which may be served through its registered agent for service of process. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania.

55. The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v.*

*USDOJ*, 784 F.3d 448 (8th Cir. 2015). Neither the DEA[6] nor the wholesale distributors[7] will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the many claims asserted herein.

56.     Consequently, Plaintiff Hospitals have named the three (3) wholesale distributors (i.e., AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation) which dominate 85% of the market share for the distribution of prescription opioids, whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal Health, Inc., McKesson Corporation, and AmerisourceBergen Drug Corporation predecessors). Each has been investigated and/or fined by the DEA for the failure to report suspicious orders. Plaintiff has reason to believe each has engaged in unlawful conduct which resulted in the diversion of prescription opioids into Plaintiff's community and that discovery will likely reveal others who likewise engaged in unlawful conduct. Plaintiff names each of these corporations herein as defendants and places the industry on notice that the Plaintiff is acting to abate the public nuisance plaguing the community. Plaintiff will request expedited discovery pursuant to Rule 26(d) of the Federal Rules of Civil Procedure to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

_____

[6] Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[7] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832- PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available. Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

### III. JURISDICTION AND VENUE

57.     This Court has original jurisdiction over this action for purposes of pretrial proceedings pursuant to 28 U.S.C. § 1407, and Case Management Order One entered in In Re: National Prescription Opiate Litigation (1:17-CV-2804, N.D. Ohio, April 11, 2018).

58.     Jurisdiction and venue for remand or trial of this action is proper in the Northern District of Alabama ("NDAL"). All Defendants do business by agent in Alabama and are part of a series of distribution agreements providing opioid drugs to distribution centers, pharmacies, and healthcare professionals through the State of Alabama. The amount in controversy exceeds the jurisdictional minimum of the NDAL.

59.     Venue is proper in the NDAL because a significant amount of those actions giving rise to the claims for relief arose in the NDAL, and all other related claims are also proper in the NDAL as additional claims against the named Defendants.

60.     NDAL has personal jurisdiction over the Defendants because they conduct business in Alabama, directly and through the purposeful direction of their actions towards Alabama and have the requisite minimum contacts with Alabama necessary to constitutionally permit the NDAL to exercise jurisdiction.

### VI. TOLLING AND FRAUDULENT CONCEALMENT

61.     Plaintiffs continue to suffer harm from the unlawful actions by the Defendants.

62.     The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The

public nuisance remains unabated.

63. Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status and to continue generating profits. The Defendants affirmatively assured the public that they are working to curb the opioid epidemic.

64. The Defendants not only have acknowledged that they understood their obligations under the law, but they further publicly affirmed their claim that their conduct was in compliance with those obligations.

65. The Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, which would confirm the extent of their wrongful and illegal activities.

66. The Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Defendants invented the term "pseudoaddiction" and promoted it to an unsuspecting medical community. Defendants provided the medical community with false and misleading information about ineffectual medical strategies to avoid or control opioid addiction. Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.

67. The medical community and consumers were duped by the Defendants' campaign to

19

misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the state of Alabama.

68.     Plaintiff Hospitals and the citizens of the state of Alabama reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

69.     Plaintiff Hospitals' claims are equitably tolled because Defendants knowingly and fraudulently concealed the facts and their wrongful acts, and the material information pertinent to their discovery, which Defendants concealed them from Plaintiff Hospitals. Plaintiff Hospitals did not know, or could not have known through the exercise of reasonable diligence, of its claims, as a result of Defendants conduct.

70.     The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiffs filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

71.     In light of their statements to the media, in legal filings, and settlements, Defendants had actual and constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

72.     Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff Hospitals were unable to obtain vital information bearing on its claims absent any fault or lack of diligence on their part.

**COUNT I**

20

## NEGLIGENCE

The Plaintiffs incorporate Paragraphs 1 through 72 as if fully restated and set forth herein.

73.     The Defendants owe a duty to use reasonable care to prevent causing harm to the Plaintiffs resulting from the Defendants' marketing, distribution, delivery, and sale of prescription opioids in the State of Alabama and particularly in the Plaintiff Hospitals.

74.     The Defendants also owe a duty to the Plaintiffs to maintain all appropriate licensing in Alabama to distribute prescription opioids, to investigate and report on improper, suspicious and illegal orders, and to prevent and stop any and all illegitimate shipments and distributions of opioids into this State.

75.     The Defendants are further under a legal duty to protect the health and welfare of the citizens of Alabama by following federal and state laws concerning misuse and abuse of controlled substances.[8]

76.     Rather than uphold and follow their duties as set forth above, imposed by statute and at common law, the Defendants, individually and collectively, worked to breach their duties, both directly and by subterfuge, artifice and deception. The Defendants' breach of duty in many cases is willful, reckless, wanton and in total disregard of the safety of the public.

77.     As a result of the Defendants' breach of their legal duties, Alabama suffers the highest rate of prescription opioid usage in America at an astonishing rate of 142.9 prescriptions per 100

---

[8] Ala. Code §§ 20-2-52, § 20-2-56, § 20-2-57, and Alabama Administrative Code §§ 680-X-3.05, § 680-X-2-.23(k)(3), and laws incorporated therein, including federal controlled substance laws, which are public safety laws. The Alabama Legislature has found that "the division, abuse, and misuse of prescription medications classified as controlled substances under the Alabama Uniform Controlled Substances Act constitutes a serious threat to the health and welfare of the citizens of the State of Alabama." ALA. CODE § 20-2-210.

people. Prescription rates of benzodiazepine and other synthetic opioids are at equally high rates in Alabama.

78.     The volume of prescription opioids written, sold, shipped and delivered by Defendants to the Plaintiff Hospitals, and the geographic area serviced by Plaintiff Hospitals, is beyond the amount that a reasonably prudent corporate entity would provide under similar circumstances given the applicable regulations and knowledge available to the Defendants.

79.     The Defendants' marketing and promotion of their opioid prescription drug products is inconsistent and contrary to the actions of reasonably prudent corporate entities under similar circumstances given the applicable knowledge and information of the Defendants that they have created an opioid drug crisis across America and in the Hospitals named as Plaintiffs in this lawsuit. Instead of exercising caution, issuing reports to federal, state and local governments about out of control opioid distribution and use, the Defendants actively worked to sell and distribute more prescription opioids without regard for the consequences and damages being caused to the Plaintiffs.

80.     The Defendants know that there is a strong connection between abuse of prescription opioids and the use of heroin. The strongest and most direct indicator of heroin usage is introduction to, and abuse of, prescription opioids. Government studies have linked the use and abuse of prescription painkillers to the growing use of heroin and the resulting occurrence of overdoes and deaths from heroin.

81.     Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

      a.     Consciously supplying the market in the geographic area served by JPJ HOSPITAL with highly-addictive prescription opioids, including

22

misrepresenting, understating, or obfuscating the highly addictive propensities of opioid pills;

b.  Using unsafe marketing, labeling, distribution, and dispensing practices, including failing to warn or advise physicians to conduct an addiction family history of each and every potential patient;

c.  Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d.  Failing to properly train or investigate their employees;

e.  Failing to properly review and analyze prescription orders and data for red flags;

f.  Failing to report suspicious orders or refuse to fill them;

g.  Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

h.  Failing to police the integrity of their supply chains; and

i.  Creating misleading information with the intention of having prescribing physicians rely upon it.

82.  Defendants sold prescription opioids in the supply chain knowing (a) there was a substantial likelihood many of the sales were for non-medical purposes and, (b) opioids are an inherently dangerous product when used for non-medical purposes, and (c) that every patient, before being prescribed even one opioid pill, needed to have a complete family history of addiction to alcohol and drugs, with any such history as a contraindication of any opioid use.

83.  Defendants' breach of duty and failure to use reasonable care in the distribution,

23

investigation, reporting, marketing, delivery and sale of prescription opioids have led to the resulting heroin abuse and addiction experienced by the citizens of the Plaintiff Hospitals, in addition to the illegal distribution of prescription opioids in the Plaintiff Hospitals.

84.     As a result of the Defendants' breach of duty and failure to use reasonable care, the Plaintiffs have been and continue to be damaged through the rampant distribution of prescription opioids that the Defendants were under a duty to monitor and control, but instead enabled, expanded and participated in the wrongful distribution of their products.

85.     As a proximate result of the Defendants' conduct, the Plaintiffs have been damaged, and will continue to be damaged, and seek full compensatory as well as punitive damages where applicable, for their damages including the following, *to wit*;

- The Plaintiffs have expended substantial sums of money and will face skyrocketing costs for continued treatment and cure of opioid addiction;

- Emergency medical care to patients without insurance and ability to pay who suffer from opioid addiction, opioid related conditions and for life threatening overdoses;

- Emergency room care;

- Costs for professionals to render care and treatment for patients admitted form opioid related care;

- Costs for overdose medication, withdrawal medication, and medication for opioid related health problems and complications;

- Life support treatment and related costs;

- Administration costs;

- Occupancy costs, per diem bed costs and room costs;

- Physical costs and reimbursements;

- Unpaid and underpaid costs and expenditures;

- Neonatal treatment for infants born to opioid addicted mothers, including, but not limited to, birth complications, dangerously low birth weights, respiratory issues, neonatal withdrawal syndrome and long term health complications;

- Counseling, social services and addiction services; and

- Interest, collection costs, and attorneys fees.

### COUNT II
### FRAUD AND MISREPRESENTATION

The Plaintiffs incorporate Paragraphs 1 through 85 as if fully restated and set forth herein.

86.    This Count is brought pursuant to Alabama Code §§ 6-5-101 to 6-5-104 (1975).

87.    The Defendants have separately and severally committed misrepresentation, deceit, concealment and fraud.  The Defendants have separately and severally committed fraud and misrepresentation through:

- the willful, reckless or mistaken representations of materials facts;

- the suppression of material facts that Defendants were under a duty to communicate;

- the concealment of material facts with the intent to deceive and mislead;

- the misrepresentation of material facts made willfully to induce actions to the Plaintiffs' detriment; and

- the intentional misrepresentation of material facts with knowledge of the falsity of the representations with intent the Plaintiffs would rely on the representations to their detriment.

88.    In an effort to mislead the public concerning risks, benefits and safety of prescription opioids, the Defendants worked both individually and in concert to deceptively market and falsely present their products.

25

89.     Similarly to the deceptions inflicted on the American public by the tobacco companies denying the addictive nature of smoking and the serious adverse health effects caused by smoking, the Defendants have worked in concert to minimize the addictive aspects of opioids and the serious adverse consequences of using prescription opioids.

90.     Through their actions and marketing efforts to the public, patients and healthcare professionals, including hospitals, doctors and nurses, the Defendants spent millions of dollars to conduct a campaign of fraudulent misrepresentations, including, *to wit*:

- misrepresenting and misleading the truth about opioids and addiction;

- misrepresenting that opioids improve function;

- misrepresenting that opioid dependancy can be managed;

- misrepresenting that opioid prescriptions create dependency leading to illegal street drugs;

- misrepresenting that opioids should be used for very short periods of time and not for chronic pain;
- misrepresenting that Defendants had funded alleged "independent research" to support their misrepresentations and fraudulent claims concerning the effectiveness of opioid derivatives to prevent or minimize addiction risks;

- misrepresenting that opioid withdrawal could be easily and simply managed;

- falsely and fraudulently stating that opioid dosage posed no significant risks to patients; and

- falsely and fraudulently suppressing the serious adverse effects of opioids while overstating the risks and potential complications from use of alternative forms of pain treatment.

91.     Defendants' fraud and misrepresentation has exacted a financial burden for which the Plaintiffs seek relief and damages.  Categories of past and continuing sustained damages include, but are not limited to, the following:

- The Plaintiffs have expended substantial sums of money and will face skyrocketing costs for continued treatment and cure of opioid addiction;

- Emergency medical care to patients without insurance and ability to pay who suffer from opioid addiction, opioid related conditions and for life threatening overdoses;

- Emergency room care;

- Costs for professionals to render care and treatment for patients admitted form opioid related care;

- Costs for overdose medication, withdrawal medication, and medication for opioid related health problems and complications;

- Life support treatment and related costs;

- Administration costs;

- Occupancy costs, per diem bed costs and room costs;

- Physical costs and reimbursements;

- Unpaid and underpaid costs and expenditures;
- Neonatal treatment for infants born to opioid addicted mothers, including, but not limited to, birth complications, dangerously low birth weights, respiratory issues, neonatal withdrawal syndrome and long term health complications;

- Counseling, social services and addiction services; and

- Interest, collection costs, and attorneys fees.

## COUNT III
## NUISANCE

The Plaintiffs incorporate Paragraphs 1 through 91 as if fully restated and set forth herein.

92.     Plaintiff Hospitals have standing to pursue nuisance claims against the Defendants for public nuisance pursuant to Ala. Code § 6-5-121 (1975).

93.     Plaintiff Hospitals have standing to pursue nuisance claims against the Defendants

27

for public nuisance pursuant to Ala. Code § 11-1-2 (1975).

94.     Patients and citizens of the geographic areas serviced by Plaintiff Hospitals have the right to be protected from dangers to the public health, safety and welfare resulting from a public nuisance.

95.     Pursuant to Alabama law, a nuisance includes "anything that works, hurt, inconvenience or damage to another" and a public nuisance is defined as anything "which damages all persons who come within the spear of its operation, though it may vary in its effects on individuals." Ala. Code § 6-5-121 and 122 (1975).

96.     The Defendants, individually as well as acting through their agents, and in concert with one another, have created an opioid epidemic that has created harm, damage and inconvenience to the Plaintiffs and their residents. Although the effects of the nuisance created by the Defendants may vary on individuals within the Plaintiff Hosptials, the Defendants have created a nuisance, and damaged the public by engaging in the following conduct, *to wit*:

- creating, financing and supporting the distribution of patient and prescriber education materials misrepresenting data concerning the safety efficacy of opioids for long-term treatment of chronic non-cancer pain, including the known rates of abuse and addiction and the lack of validation of the same for long-term efficacy;

- developing and disseminating misleading scientific studies concluding the safety of opioids for long-term treatment of chronic non-cancer pain;

- developing and disseminating misleading scientific studies based on incomplete or inadequate data while concealing facts about the danger of prescription opioids;

- sponsoring, distributing and assisting in the distribution of publications presenting an unbalanced presentation of the long-term dose and dependent risks of opioids versus alternatives;

28

- creating, sponsoring and distributing patient education materials to consumers containing deceptive statements about opioid use;

- marketing opioid drugs as safe and effective for long-term treatment of chronic pain conditions when they were not safe, for the purpose of deceiving physicians into using and prescribing addictive opioid drugs to their patients;

- distributing brochures to doctors, patients and law enforcement officials that included statements concerning the indicators of possible opioid abuse;

- disseminating misleading statements regarding the true risk of addiction and promoting the concept of pseudoaddiction through Defendants' own unbranded publications on internet sites, operated by the Defendants, directed to care givers, consumers and healthcare professionals;

- acting intentionally, recklessly and unlawfully in failing to maintain controls against prescription opioid diversion through monitoring, reporting and in recognition of the Defendants' duty to refuse to fill suspicious orders of opioids;

- by refusing to fill suspicious and unwarranted orders of prescription opioids in order to maintain effective controls against drug diversion and unlawfully continuing the ship prescription opioids to the Plaintiff Hosptials; and

- marketing, distributing and selling prescription opioids which the Defendants knew, or should have known, were being diverted for non-legitimate, non-medical use, with a substantial likelihood of illegal and improper distribution to the public.

97.    The Defendants' actions are continuing in nature and as a result of said actions, the Defendants have negatively impacted the rights of the patients and citizens of the geographic areas serviced by the Plaintiff Hospitals to live without unreasonable interference to the public health, safety, welfare, peace, comfort and convenience, unreasonable threat of crime, and the right to be free from disturbance without the unreasonable apprehension of danger to personal property resulting from the opioid epidemic.

98.    The Defendants' actions, separate and severally, have been, and continue to be, a

substantial factor in opioids becoming widely available and widely used for non-medical purposes. The Defendants, separately and severally, have a responsibility, and legal obligation, within the system of opioid distribution to refrain from conduct that would create a widespread nuisance which negatively affects the Plaintiff Hospitals, creating an enormous public health crisis resulting from the overuse of prescription opioids and heroin.

99.     The Defendants' conduct is a direct and proximate cause of death, injury and damage to the patients and citizens of the geographic area serviced by the Plaintiff Hospitals, which has caused financial damage to Plaintiff Hospitals, and if allowed to continue, unabated, will continue to threaten the health, safety and welfare of the Plaintiff Hospitals.

100.    The Defendants' conduct is ongoing and persistent, and the Plaintiffs seek to recover all damages flowing from the Defendants' conduct; including, but not limited to, abatement of the nuisance and all harm created by the Defendants' conduct, *to wit*:

- The Plaintiffs have expended substantial sums of money and will face skyrocketing costs for continued treatment and cure of opioid addiction;

- Emergency medical care to patients without insurance and ability to pay who suffer from opioid addiction, opioid related conditions and for life threatening overdoses;

- Emergency room care;

- Costs for professionals to render care and treatment for patients admitted form opioid related care;

- Costs for overdose medication, withdrawal medication, and medication for opioid related health problems and complications;

- Life support treatment and related costs;

- Administration costs;

- Occupancy costs, per diem bed costs and room costs;

- Physical costs and reimbursements;

- Unpaid and underpaid costs and expenditures;

- Neonatal treatment for infants born to opioid addicted mothers, including, but not limited to, birth complications, dangerously low birth weights, respiratory issues, neonatal withdrawal syndrome and long term health complications;

- Counseling, social services and addiction services; and

- Interest, collection costs, and attorneys fees.

101.    In addition to the compensatory damages sought above for actual damages and abatement damages, Plaintiffs claim the right to be compensated in punitive damages against the Defendants as a result of their deliberate and intentional actions committed with malice and oppression and with knowledge that their actions would likely result in grave harm.

**COUNT IV**
**DRUG NUISANCE**
**ALABAMA STATUTE § 6-5-155 *et seq*.**

The Plaintiffs incorporate Paragraphs 1 through 101 as if fully restated and set forth herein.

102.    It cannot be denied there is an opioid epidemic in America and the epidemic has resulted in increased financial costs to hospitals to address public health issues.

103.    As stated herein, the Defendants' actions in the marketing, presentation, representation, distribution, advertising, and sale of prescription opioids has created consumption of opioid related drugs that has become dangerous and harmful to the public welfare.  Prescription opioid abuse has led to increased crime and criminal activity in the State of Alabama, as well as in the Plaintiff Hospitals.

104.    In the Plaintiff Hospitals, the nationwide opioid epidemic has been especially

31

damaging, impacting people from all walks of life from newborns to the elderly, including all races and socio-economic levels of the population.  By their conduct, the Defendants have created a drug related nuisance in the Plaintiff Hospitals.[9]

105.    Alabama recognizes that drugs can have a tremendous negative impact on communities, such as the geographic areas serviced by Plaintiff Hospitals.  The Alabama Code defines a "Drug-Related Nuisance" as the "sale, distribution, possession, storage, transportation or manufacture of any controlled substance in violation of the controlled substances acts, or similar act of the United States or any other state" that causes harm to a community.  Ala. Code § 6-5-155.

106.    There is a duty and corresponding right provided under Alabama law for any person to take action against drug related nuisances to "file an action in the circuit courts of this state to abate, enjoin, and prevent the drug-related nuisance."  Ala. Code § 6-5-155(2).

107.    The Alabama Uniform Controlled Substance Act, the U.S. Controlled Substances Act and regulations promulgated by the Alabama State Board of Pharmacy proscribe Defendants' manufacture and distribution of opioids while failing to maintain effective controls against diversion. *See, e.g.,* 21 C.F.R. § 1301.74(b); 21 U.S.C. § 823(a)(1), (b)(1); ALA. CODE §§ 20-2-56 and 57; ALA. ADMIN. CODE §680-X-3-.05. This manufacture and distribution in violation of the controlled substance acts or similar act of the United States constitutes a Drug-Related Nuisance. As a result of the drug-related nuisance created by the Defendants, and as elaborated in the preceding paragraphs, the Plaintiff Hospitals have sustained damages, harm and unreasonable jeopardy to the

---

[9] For purposes of the Drug-Related Nuisance statute, "controlled substance acts" are defined as "[t]he provisions of Sections 20-2-1 et seq., known as the "Alabama Uniform Controlled Substance Act," and Sections 13A-12-201 et seq., known as "The Drug Predator Control Act of 1987," and Sections 13A-12-210 et seq., known as "The Drug Crimes Amendments Act of 1987." ALA. CODE § 6-5-155.1.

health, morals, comfort, welfare and safety of their communities and to their residents.

108.    The Defendants' conduct is ongoing and persistent, and the Plaintiffs seek to recover all damages flowing from the Defendants' conduct; including, but not limited to, abatement of the nuisance and all harm created by the Defendants' conduct, *to wit*:

- The Plaintiffs have expended substantial sums of money and will face skyrocketing costs for continued treatment and cure of opioid addiction;

- Emergency medical care to patients without insurance and ability to pay who suffer from opioid addiction, opioid related conditions and for life threatening overdoses;

- Emergency room care;

- Costs for professionals to render care and treatment for patients admitted form opioid related care;

- Costs for overdose medication, withdrawal medication, and medication for opioid related health problems and complications;

- Life support treatment and related costs;

- Administration costs;

- Occupancy costs, per diem bed costs and room costs;

- Physical costs and reimbursements;

- Unpaid and underpaid costs and expenditures;

- Neonatal treatment for infants born to opioid addicted mothers, including, but not limited to, birth complications, dangerously low birth weights, respiratory issues, neonatal withdrawal syndrome and long term health complications;

- Counseling, social services and addiction services;

- Interest, collection costs, and attorneys fees; and

- daily statutory fines as provided under Alabama law.

§ 6-5-155.7, Ala. Code (1975)

109.    In addition to the compensatory and statutory damages sought above for actual damages and abatement costs, Plaintiffs claim the right to be compensated in punitive damages against the Defendants as a result of their deliberate and intentional actions committed with malice and oppression and with knowledge that their actions would likely result in grave harm.

## COUNT V
## CIVIL CONSPIRACY

The Plaintiffs incorporate Paragraphs 1 through 109 as if fully restated and set forth herein.

110.    Alabama law recognizes a civil conspiracy cause of action where multiple parties act in concert to commit wrongful acts.  The Defendants have in the past, and continue through the present, to work in a concerted effort to profit from the sale of prescription opioid drugs through violations of their statutory duties under the Controlled Substances Act, 21 U.S.C. § 801(2), 21 U.S.C. § 821-824 and 21 U.S.C. § 823(6)(1).

111.    The Defendants, separately and severally, encouraged their wholesalers and pharmacists to purchase ever increasing amounts of prescription opioids, and to increase their sales volume, by providing them discounts and rebates based upon market share and sales volume.  The Defendants worked in concert to incentivize purchases of wholesale prescription opioid drugs so that they could decrease their costs per pill and increase their profits.  By decreasing volume purchase prices to high volume distributors and pharmacies, the Defendants' distributors could maintain prescription opioid drug costs while increasing their profits.

112.    The Defendants, working clandestinely, incentizied their distributors and pharmacies to boost opioid sales through a series of contractual relationships allowing for the coordination of

sales activities, incentives and increased profits.

113.    As a result of the Defendants' conspiratorial activities and incentives, the sales volume of prescription opioids increased dramatically, along with revenues, with a corresponding increase of illegitimate, improper and illegal prescription opioids being distributed to the public.

114.    Under constant pressure from Defendants to increase sales, wholesale distributors and pharmacies were directed to sell more opioids, fill more "borderline" or suspicious orders, and increase distribution amounts of opioid based prescription drugs to the point that it was obvious to those taking part in the conspiracy that a large amount of the prescription drug sales could not possibly be legitimate, that there could not be any legitimate medical justification for the skyrocketing opioid sales, and that opioid distribution was exponentially exceeding reasonable limits.

115.    Defendants' statutory duties of reporting unusual sales, suspect transactions and unlawful diversion of dangerous controlled substances, were (and are) being ignored.  The Defendants and their distributors were on notice from the United States Government that repeated DEA enforcement actions were being conducted in the State of Alabama, and that a vast amount of prescription opioids were being abused and diverted in the State of Alabama, and the Defendants' legal obligations to maintain "effective controls" to prevent the illegal sale and distribution of prescription opioid drugs were being ignored and overlooked.

116.    Ignoring their legal and statutory duties, the Defendants not only disregarded danger signs, but advanced policies and procedures to cover up their illegal (but highly profitable) conduct in a conspiracy to sell more prescription opioids.  In disregard of the facts indicating an opioid epidemic, the Defendants have continued their "aggressive marketing" practices.

117.     To justify the alarming number of opioids distributed across America and within Alabama, the Defendants advanced their conspiracy through the misrepresentation of their products including the public's need for opioids and the lack of legitimate reasons for skyrocketing consumption numbers, including, *to wit*:

- misrepresenting and misleading the truth behind increasing sales and opioid addiction;

- misrepresenting that opioids improve patient function;

- misrepresenting that opioid dependancy can be effectively managed;

- misrepresenting that opioid prescriptions create dependency leading to illegal street drug consumption;

- misrepresenting that opioids should be used for very short periods of time and not for chronic pain;

- misrepresenting that Defendants had funded alleged "independent research" to support their misrepresentations and fraudulent claims concerning the effectiveness of opioid derivatives to prevent or minimize addiction risks;

- misrepresenting that opioid withdrawal could be easily and simply managed;

- falsely and fraudulently stating that opioid dosage posed no significant risks to patients; and

- falsely and fraudulently suppressing the serious adverse effects of opioids while overstating the risks and potential complications from use of alternative forms of pain treatment.

118.     Defendants' conspiracy has exacted a financial burden upon Plaintiff Hospitals, for which Plaintiffs seek relief and damages.  Categories of past and continuing sustained damages include, but are not limited to, the following:

- The Plaintiffs have expended substantial sums of money and will face skyrocketing costs for continued treatment and cure of opioid addiction;

36

- Emergency medical care to patients without insurance and ability to pay who suffer from opioid addiction, opioid related conditions and for life threatening overdoses;

- Emergency room care;

- Costs for professionals to render care and treatment for patients admitted form opioid related care;

- Costs for overdose medication, withdrawal medication, and medication for opioid related health problems and complications;

- Life support treatment and related costs;

- Administration costs;

- Occupancy costs, per diem bed costs and room costs;

- Physical costs and reimbursements;

- Unpaid and underpaid costs and expenditures;

- Neonatal treatment for infants born to opioid addicted mothers, including, but not limited to, birth complications, dangerously low birth weights, respiratory issues, neonatal withdrawal syndrome and long term health complications;

- Counseling, social services and addiction services; and

- Interest, collection costs, and attorneys fees.

## COUNT VI
### WANTON-INTENTIONAL CONDUCT
### PUNITIVE DAMAGES

The Plaintiffs incorporate Paragraphs 1 through 118 as if fully restated and set forth herein.

119.    The Defendants' actions, separately and severally, are the product of their conscious disregard of the rights and safety of Plaintiff Hospitals, the patients of Plaintiff Hospitals and the citizens of the geographic areas serviced by Plaintiff Hospitals, with the attendant awareness that harm will (and has) likely result from the Defendants' actions.

37

120. The actions of the Defendants are set forth in the preceding counts and paragraphs of this Complaint and are incorporated herein by reference. The Defendants' actions are willful, wanton, intentional and committed with reckless disregard for the rights and safety of Plaintiff Hospitals, the patients of Plaintiff Hospitals and the citizens of the geographic areas serviced by Plaintiff Hospitals.

121. The conduct of the Defendants has been, and continues to be, willful as defined by Alabama law such that Defendants were aware that their actions, as well as their failure to act in stopping and preventing improper opioid distribution, would cause harm to the public.

122. While the Defendants may not have intended harm to the specific named Plaintiffs in this case, the Defendants knew their breach of their legal duties would cause great harm to the American public and Alabamians in particular yet they proceeded in their efforts to distribute and sell prescription opioids in disregard of the rights and safety of Plaintiff Hospitals, the patients of Plaintiff Hospitals and the citizens of the geographic areas serviced by Plaintiff Hospitals.

123. The actions of the Defendants, separately and severally, have combined and concurred to harm the Plaintiff Hospitals, and the actions of the Defendants have all contributed to cause the Plaintiffs' damages.

124. The actions of the Defendants have, and continue to be, carried on with a reckless and/or conscious disregard for the rights, welfare and safety of Plaintiff Hospitals, the patients of Plaintiff Hospitals and the citizens of the geographic areas serviced by Plaintiff Hospitals

125. The actions of the Defendants have, and continue to be, the source of unjust hardship to the Plaintiff Hospitals, the patients of Plaintiff Hospitals and the citizens of the geographic areas serviced by Plaintiff Hospitals

38

126. The actions of the Defendants have, and continue to be, wrongful actions without just cause or excuse.

127. The Plaintiffs demand judgment from the Defendants in an amount of money sufficient to punish the Defendants for their wrongful conduct and to protect the public by deterring and discouraging the Defendants and others from doing the same or similar wrongs in the future.

**COUNT IV**
**RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**"RICO" 18 U.S.C. 1961, *et seq*.**

The Plaintiffs incorporate Paragraphs 1 through 127 as if fully restated and set forth herein.

128. Plaintiffs bring this RICO Count against all Defendants.

129. The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

130. Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); *United States v. Turkette*, 452 U.S. 576, 580 (1981).

131. The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 580; *Boyle v. U.S.*, 556 U.S. 938, 944 (2009). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within

39

its scope.

132.    The RICO Defendants aggressively sought to build their revenue, increase profit and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the RICO Defendants operated and continue to operate within the "closed system" created under the Controlled Substances Act, 21 U.S.C. § 821, *et seq.* (the "CSA"). The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales and report them to the DEA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

133.    The Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders and to notify the DEA of suspicious orders.[10]   The RICO Defendants placed hundreds of millions of pills into the illicit market, which allowed them to generate obscene profits, by the unlawful sales of opioids.

134.    Each of the RICO Defendants were associated with and conducted or participated in the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid

---

[10]  21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).

Diversion Enterprise"), the purpose of which was to engage in the unlawful sales of opioids, while deceiving the public and federal and state regulators into believing that the RICO Defendants were fulfilling their statutory obligations.  As a direct result of the RICO Defendants' fraudulent scheme, course of conduct and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the American public.  The RICO Defendants' misconduct violated Section 1962(c), and 18 U.S.C. § 1964(c) entitles Plaintiffs to treble damages for its injuries.

135.    The RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States. The Healthcare Distribution Alliance (the "HDA") is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

136.    Each of the RICO Defendants is a legal entity separate and distinct from the HDA. Additionally, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

137.    The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively

41

referred to as the "Opioid Diversion Enterprise."

### A. THE OPIOID DIVERSION ENTERPRISE

138.    The United States Congress enacted the Controlled Substances Act in 1970.[11]  The CSA and its implementing regulations created a closed system of distribution for all controlled substances.  The closed chain of distribution was intended to prevent the diversion of legally produced controlled substances into the illicit market.  Congress specifically designed the closed system to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants – manufacturers and distributors alike – must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.  When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse.  The result is the scourge of addiction that has occurred.

139.    The closed system created by the CSA required the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances] and requiring order forms for all transfers of these drugs."  The DEA published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."

140.    It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota

---

[11] Joseph T. Rannazzisi Decl. ¶ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

assigned to it by DEA or (2) in excess of a quota assigned to it by the DEA.

141.    At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.[12]

142.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) was characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and requests that the DEA increase production quotas, all so that the RICO Defendants

---

[12]    The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone and oxycodone increased 13-fold, 4-fold and 9 fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the country with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.  Am J Public Health 2014; 104(2):e52-9.

would have a larger pool of prescription opioids from which to profit.

143.    The Opioid Diversion Enterprise functioned by selling prescription opioids. The RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids and the identification, investigation and reporting of suspicious orders of prescription opioids destined for the illicit drug market.

144.    The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across state lines, such as manufacture, sale, distribution and shipment of prescription opioids throughout the country and this jurisdiction and the corresponding payment and/or receipt of money from the sale of the same.

145.    The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.  Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein.

146.    The Healthcare Distribution Alliance ("HDA") led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, were members of the HDA.[174] Additionally, the HDA and each of the Distributor Defendants eagerly sought the active membership

44

and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

147.    The HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners" and "make connections." The HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

148.    There are two types of memberships in the HDA; manufacturer and distributor.  The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants.  A "senior company executive" must sign the manufacturer membership application, and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also requests that the manufacturer identify its current distribution information and its most recent year-end net sales through any HDA distributors. After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups.

149.    The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.  The HDA also offers a multitude of conferences,

including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues." The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."

150.    The RICO Defendants maintained their interpersonal relationships by working together, exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

151.    The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids. As reported in the Washington Post, identified by Senator McCaskill and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales. On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.  The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

152.    The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants

operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the RICO Defendants were in communication and cooperation.

153.     The RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Plaintiffs are informed and believe that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

154.     From 2006 to 2016, the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures. Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.

### B.     CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

155.     During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their Federal and State obligations to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market and to halt such unlawful sales so as to increase production quotas and generate unlawful profits, as follows:

156.     Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

47

157.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

158.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

159.    Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum. The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids.

160.    The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

161.    The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act.

162.    The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiffs are informed and believe that the Manufacturer Defendants used the chargeback program to acquire detailed, high-level data regarding sales of the opioids they manufactured. Additionally, Plaintiffs are informed and believe

that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

163.    The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids the RICO Defendants had not properly investigated or reported.

164.    The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids. On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances they sold compared to controlled substances, whether the pharmacy buys from other distributors, and the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

165.    The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012 and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders -- all for failure to report suspicious orders.

166.    Defendants' scheme had a decision-making structure driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

167.    The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was proopioid. The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

168.    The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders.

169.    The scheme the RICO Defendants devised and implemented amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

C.    **PATTERN OF RACKETEERING ACTIVITY**

170.    The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) and (18 U.S.C. §

1961(D)) by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

## 1.     The RICO Defendants Engaged in Mail and Wire Fraud

171.    The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

172.    The RICO Defendants committed, conspired to commit and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.,* violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels and employees of the Opioid Diversion Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the internet to transmit mailings and wires in interstate or foreign commerce.

173.    The RICO Defendants used, directed the use of and/or caused to be used thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of

51

selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

174.     In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

175.     The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a.     Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market and sell the prescription opioids by means of false pretenses, misrepresentations, promises and omissions.

    b.     Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market and sell the prescription opioids by means of false pretenses, misrepresentations, promises and omissions.

176.     The RICO Defendants' use of the mail and wires includes, but is not limited to, Manufacturers, Distributors or third parties that were foreseeably caused to conduct the transmission, delivery or shipment of the following as a result of the RICO Defendants' illegal scheme, including but not limited to:

    a.     The prescription opioids themselves;

    b.     Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

    c.       Defendants' DEA registrations;

    d.       Documents and communications that supported and/or facilitated Defendants' DEA registrations;

    e.       Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas and procurement quotas;

    f.       Defendants' records and reports that 21 U.S.C. § 827 required Defendants to submit to the DEA;

    g.       Documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

    h.       Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

    i.       Documents for processing and receiving payment for prescription opioids;

    j.       Payments from the Distributors to the Manufacturers;

    k.       Rebates and chargebacks from the Manufacturers to the Distributors;

    l.       Payments to Defendants' lobbyists through the Pain Care Forum;

    m.       Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

    n.       Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

    o.       Other documents and things, including electronic communications.

177.    On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

178.    The RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and their compliance with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

179.    Plaintiffs are also informed and believe that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales and to transmit payments and rebates/chargebacks.

180.    The RICO Defendants also communicated by U.S. Mail, by interstate facsimile and by interstate electronic mail with each other and various other affiliates, regional offices, regulators, distributors and other third-party entities in furtherance of the scheme.

181.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids, all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Defendants intended their scheme and common course of conduct to increase or maintain high production quotas for their prescription opioids from which they could profit.

182.    Defendants have deliberately hid many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities, and these cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of and, in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents

described in the preceding paragraphs.

183.    The Defendants, for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by interstate carrier, shipments of prescription opioids affecting interstate commerce, including the following:

Please see chart on next page.

| Defendant Group Name | Company Name | Drugs | | |
|---|---|---|---|---|
| | | Drug Name | Chemical Name | CSA Schedule |
| Purdue | (1) Purdue Pharma, LP, (2) Purdue Pharma, Inc., (3) The Purdue Frederick Company | OxyContin | Oxycodone HCL ER | Schedule II |
| | | MS Contin | Morphine Sulfate ER | Schedule II |
| | | Dilaudid | Hydromorphone HCl | Schedule II |
| | | Dilaudid-HP | Hydromorphone HCl | Schedule II |
| | | Butrans | Buprenorpine | Schedule III |
| | | Hysingla ER | Hydrocodone Bitrate | Schedule II |
| | | Targiniq ER | Oxycodone HCl and Naloxone | Schedule II |
| Cephalon | (1) Cephalon, Inc., (2) Teva Pharmaceutical Industries, Ltd, (3) Teva Pharmaceuticals USA, Inc. | Actiq | Fentanyl Citrate | Schedule II |
| | | Fentora | Fentanyl Citrate | Schedule II |
| | | Generic Oxycontin | Ocycodone HCl | Schedule II |
| Janssen | (1) Johnson & Johnson; (2) Janssen Pharmaceuticals, Inc. (formerly (2a) *Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, formerly (2b) *Janssen Pharmaceutica, Inc.* (3) Noramco, Inc. | Duragesic | Fentanyl | Schedule II |
| | | Nucynta | Tapentadol | Schedule II |
| | | Nucynta ER | Tapentadol ER | Schedule II |
| Endo | (1) Endo Health Solutions Inc., (2) Endo Pharmaceuticals Inc., (3) Qualitest Phamaceuticals, Inc. | Opana ER | Oxymorphone HCl ER | Schedule II |
| | | Opana | Oxymorphone HCl | Schedule II |
| | | Percodan | Oxymorphone HCl and Aspirin | Schedule II |

| | | Percocet | Oxymorphone HCl and Acetaminophen | Schedule II |
|---|---|---|---|---|
| | | Zydone | Hydrocodone Bitartrate and Acetaminophen | Schedule III |
| **Mallinckrodt** | **(1)** Mallinckrodt PLC, **(2)** Mallinckrodt, LLC | Exalgo | Hydromorphone HCl | Schedule II |
| | | Roxicodone | Oxycodone HCl | Schedule II |
| **Allergan** | **(1)** Allergan Plc **(2)** Actavis LLC, **(3)** Actavis Pharma, Inc., **(4)** Actavis Plc, **(5)** Actavis, Inc., **(6)** Watson Pharmaceuticals, Inc., **(7)** Watson Laboratories, Inc., **(8)** Watson Pharma, Inc. | Kadian | Morphine Sulfate | Schedule II |
| | | Norco | Hydrocodone and Acetaminophen | Schedule II |
| | | Generic Duragesic | Fentanyl | Schedule II |
| | | Generic Opana | Oxymorphone HCl | Schedule II |
| **Insys** | Insys Therapeutics, Inc. | Subsys | Fentynyl | Schedule II |

184.     The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share and /or minimize the losses for the RICO Defendants.

185.     The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

186.     The RICO Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities the reality of the suspicious orders that the RICO Defendants were filling on a daily basis -- leading to the diversion of tens of millions of doses of prescription opioids into the illicit market.

187.    The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

188.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

189.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenue from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims and methods of commission. The predicate acts were related and not isolated events.

190.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants, while Plaintiffs were left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The RICO Defendants committed or caused to be committed the predicate acts through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

191.    The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the enterprise.

57

192.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

193.    RICO Defendants have hidden many of the precise dates of the criminal actions at issue here, and these cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

194.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiffs. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers in this jurisdiction, its citizens or the Plaintiffs. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products. The Defendants were also aware that Plaintiffs and the citizens of this jurisdiction rely on the Defendants to maintain a closed system and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

195.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

196.     It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiffs by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

197.     The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**2.     The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances, and Their Crimes Are Punishable as Felonies**

198.     The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

199.     The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter. A violation of section 483(a)(4) is punishable by up to four years in jail, making it a felony. 21 U.S.C. § 483(d)(1).

200.     Each of the RICO Defendants qualifies as a registrant under the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant

suspicious orders of controlled substances, and inform the DEA of suspicious orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

201.     The CSA and the Code of Federal Regulations required the RICO Defendants to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

202.     The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders and/or omitted material information from reports, records and other documents they were required to file with the DEA, including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

203.     Federal authorities investigated McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form 8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.

204.     The RICO Defendants engaged in a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74. The vast number of enforcement actions available in the public record against the Distributor Defendants supports this conclusion.

205.    These actions against the Distributor Defendants confirm that the Distributor Defendants knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

206.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

207.    Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

208.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiffs. Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or the Plaintiffs. The Defendants were aware that Plaintiffs and the citizens of this jurisdiction rely on the Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

209.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

210.    It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiffs by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

211.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

### D.    DAMAGES

212.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff Hospitals' injuries in its business and property because Plaintiff Hospitals paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

213.    Defendants' racketeering activities proximately caused Plaintiff Hospitals' injuries and those of its patients and citizens of the geographic areas serviced by Plaintiff Hospitals. But for the RICO Defendants' conduct, Plaintiff Hospitals would not have incurred the costs and expenditures required as a result of the plague of drug-addicted patients and citizens.

214.    The RICO Defendants' racketeering activities directly caused Plaintiff Hospitals' injuries and those of its patients and citizens.

215.    Plaintiff Hospitals were most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

216.     Plaintiff Hospitals seek all legal and equitable relief as allowed by law, including, *inter alia,* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit, and pre- and post-judgment interest.

**COUNT V**
**RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. 1962(d), *et seq.***
**(Against All Defendants)**

The Plaintiffs incorporate Paragraphs 1 through 216 as if fully restated and set forth herein.

217.     Plaintiff Hospitals brings this claim on its own behalf against all RICO Defendants. At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Under Section 1962(d), it is unlawful for "any person to conspire to violate" Section 1962(d), among other provisions. 18 U.S.C. § 1962(d).

218.     Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

A.     **THE OPIOID DIVERSION ENTERPRISE**

219.     For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference the paragraphs set out above concerning the "Opioid Diversion Enterprise."

B.     **CONDUCT OF THE OPIOID DIVERSION ENTERPRISE**

220.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference the paragraphs set out above concerning the "Conduct of the Opioid Diversion Enterprise."

### C.    PATTERN OF RACKETEERING ACTIVITY

221.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiffs incorporate by reference the paragraphs set out above concerning the "Pattern of Racketeering Activity."

### D.    DAMAGES

222.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff Hospitals' injuries in its business and property because Plaintiff Hospitals paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

223.    Defendants' racketeering activities proximately caused Plaintiff Hospitals' injuries and those of its patients and citizens of the geographic areas serviced by Plaintiff Hospitals. But for the RICO Defendants' conduct, Plaintiff Hospitals would not have incurred the costs and expenditures required as a result of the plague of drug-addicted patients and citizens.

224.    The RICO Defendants' racketeering activities directly caused Plaintiff Hospitals' injuries and those of its patients and citizens.

225.    Plaintiff Hospitals were most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

226.   Plaintiff Hospitals seek all legal and equitable relief as allowed by law, including, *inter alia,* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit, and pre- and post-judgment interest.

### COUNT IX
### RELIEF REQUESTED

The Plaintiffs incorporate Paragraphs 1 through 226 as if fully restated and set forth herein.

WHEREFORE, in consideration of the claims stated above, the Plaintiffs in this case respectfully submit that upon a full hearing of the evidence that this Honorable Court, and the jury hearing this case, grant the following relief.

227.   Judgment in favor of the Plaintiffs against each Defendant separately and severally, based on joint and several liability, against each and every Defendant in this case;

228.   An entry of equitable relief and Order of Abatement against the Defendants, jointly and severally, along with all those acting in concert with the Defendants including all agents, subsidiaries and all other persons acting in concert or participation with the Defendants from continuing the conduct made the subject of this Complaint.

229.   An Order of Injunction against the Defendants on a permanent basis along with accompanying restitution.

230.   An Order from this Court against the Defendants that they fully compensate the Plaintiff Hospitals for past and future expenses required to abate the nuisance caused by the opioid epidemic.

231.   A judgment and award of compensatory damages, including without limitation, all damages previously outlined in this Complaint including, but not limited to, the following:

- The Plaintiffs have expended substantial sums of money and will face skyrocketing costs for continued treatment and cure of opioid addiction;

- Emergency medical care to patients without insurance and ability to pay who suffer from opioid addiction, opioid related conditions and for life threatening overdoses;

- Emergency room care;

- Costs for professionals to render care and treatment for patients admitted form opioid related care;

- Costs for overdose medication, withdrawal medication, and medication for opioid related health problems and complications;

- Life support treatment and related costs;

- Administration costs;

- Occupancy costs, per diem bed costs and room costs;

- Physical costs and reimbursements;

- Unpaid and underpaid costs and expenditures;

- Neonatal treatment for infants born to opioid addicted mothers, including, but not limited to, birth complications, dangerously low birth weights, respiratory issues, neonatal withdrawal syndrome and long term health complications;

- Counseling, social services and addiction services; and

- Interest, collection costs, and attorneys fees.

232.    In addition to the damages outlined herein, Plaintiffs demand that Defendants pay court costs, including attorneys' fees, applicable interest and all other relief as allowed under Alabama law and as this Court deems appropriate and just.

**PLAINTIFFS DEMAND TRIAL BY JURY**

Respectfully submitted,

/s/ *Jeff Friedman*

Jeff Friedman (asb-6868-n77j)
Matt Conn (asb-9628-t83c)
FRIEDMAN, DAZZIO, ZULANAS & BOWLING, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
jfriedman@friedman-lawyers.com
mconn@friedman-lawyers.com
**Attorneys for Plaintiffs**